```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
MARIA WHITLEY,

                        Plaintiff,
                                                              MEMORANDUM & ORDER
            - against -                                        19-CV-2665 (PKC) (CLP)

BUILDING SERVICE 32BJ HEALTH FUND
and BUILDING SERVICE 32BJ PENSION
FUND,

                        Defendants.
----------------------------------------------------------x
```

PAMELA K. CHEN, United States District Judge:

Plaintiff Maria Whitley, proceeding *pro se*, brought this action in the Supreme Court of New York, Queens County, against Defendants Building Service 32BJ Health Fund ("Health Fund") and Building Service 32BJ Pension Fund ("Pension Fund")—collectively, "Defendants" or "the Funds"—alleging that Defendants improperly denied her disability benefits. Defendants timely removed the action to this Court, and they now move for summary judgment. For the reasons set forth below, the Court grants Defendants' motion for summary judgment and dismisses this action.

## BACKGROUND

**I.    The Funds**

Defendants Health Fund and Pension Fund are jointly administered benefit funds established pursuant to the Taft-Hartley Act, 29 U.S.C. § 186. (Defendants' 56.1 Statement ("Defs.' 56.1"), Dkt. 26-4, ¶ 2.[1]). The Funds provide various welfare and pension benefits to

---

[1] Unless otherwise noted, a standalone citation to a party's 56.1 statement denotes that the Court has deemed the underlying factual allegation undisputed. Any citation to a 56.1 statement incorporates by reference the documents cited therein; where relevant, however, the Court may cite directly to an underlying document. The Court has deemed facts averred in a party's 56.1

1

employees of participating employers. (*Id.* ¶ 3.) Each of the funds is governed by an Agreement and Declaration of Trust ("Trust Agreement") and administered by a Board of Trustees comprised of an equal number of management and union representatives. (*Id.* ¶¶ 2–3.) In accordance with the Trust Agreements of both funds, the Trustees have the power to "adopt a Plan" and to "pay or provide for the payment of Benefits in accordance with the Plan[.]" (*See* A.R.[2] 16 (Health Fund Trust Agreement), 163 (Pension Fund Trust Agreement).) Additionally, the Trustees have the power to "process and approve or deny claims for the payment of Benefits, determining whether the conditions for the payment of Benefits . . . have been fulfilled and whether any exceptions or exclusions are applicable." (*See id.*) The Trustees also have the power to "decide, in [their] sole discretion, all questions (both factual and legal) relating to the eligibility or rights of Participants or Beneficiaries for Benefits . . . and the amount and kind of all Benefits to be paid," as well as the power to "interpret, in [their] sole discretion, all terms in" the Funds' Trust Agreements and plan documents, "including the resolution or clarification of any ambiguities, omissions, or inconsistencies." (*See id.*)

---

statement to which the opposing party cites no admissible evidence in rebuttal as undisputed. *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). Additionally, to the extent a party's 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts," the Court has disregarded the statement. *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012).

[2] "A.R." refers to the administrative record filed with the Court, which includes the Funds' governing documents as well as documents related to Plaintiff's various applications for benefits. (Dkt. 11.) Although the administrative record is filed in multiple attachments, it is continuously paginated. (*See* Dkt. 11-1 (A.R. 1–148); Dkt. 11-2 (A.R. 149–296); Dkt. 11-3 (A.R. 297–444).)

As relevant here, the Health Fund provides qualified participants with a long-term disability benefit ("LTD Benefit"), while the Pension Fund provides a disability pension ("Disability Pension"). (Defs.' 56.1, Dkt. 26-4, ¶ 6.) According to the Health Fund's Summary Plan Description ("SPD"), to qualify for an LTD Benefit, a participant must "become totally disabled while working in covered employment." (A.R. 93.) Total disability "means [the participant is] unable to work in any capacity as a result of bodily injury or disease." (*Id.*) Moreover, to qualify, the participant must have "had at least 36 consecutive months of eligibility in the [Health Fund] as a result of covered employment, and the 36 consecutive months of eligibility were immediately prior to the date [the participant] stopped working due to the disability." (*Id.*) The SPD tells participants that "[a] claim for LTD benefits should be filed as soon as possible, but not later than 9 months after [their] last day worked due to the disability." (A.R. 98.) Indeed, after this nine-month period, "it will be presumed that [the participant] did not become totally disabled while [they] were working in covered employment, unless [they] can provide the Fund with clear and convincing evidence otherwise." (*Id.*)

The requirements for a Disability Pension under the Pension Fund are more onerous. As the Pension Fund's SPD makes clear, a participant is "eligible for a Disability Pension if [they] have at least 120 months (10 years) of Service Credit and [they] become totally *and permanently* disabled while working in covered employment." (A.R. 217 (emphasis added).) The SPD gives the following explanation of what it means to become totally and permanently disabled:

> Total and permanent disability is the permanent inability to work in any capacity, as determined by the Trustees or persons they designate. You will not satisfy this definition of total and permanent disability just because you are unable to continue in your usual occupation; you must be forever unable to perform any gainful employment to meet this Plan requirement. If you first apply for your Disability Pension more than 9 months after your covered employment ended, you will have to provide clear and convincing evidence that you became totally and permanently

3

>disabled while you were still in covered employment (otherwise you would not be eligible for the Disability Pension).

(*Id.*) In December 2010, however, the Pension Fund's SPD was updated. (*See* Defs.' 56.1, Dkt. 26-4, ¶ 11; A.R. 251.) This update to the SPD added that a participant would be considered totally and permanently disabled for purposes of a Disability Pension if they submitted "a certification of a permanent disability benefit award from the Social Security Administration ["SSA"] showing that [their] disability was found to have commenced while [they] were working in Covered Employment[.]" (A.R. 270.) Yet, the Trustees also retained discretion to deem a participant totally and permanently disabled on the basis of "satisfactory" medical evidence, even without certification of a permanent disability benefit award from the SSA. (*See id.*) A participant who qualifies for a Disability Pension under the Pension Fund is not allowed to collect LTD Benefits at the same time from the Health Fund. (*See* Defs.' 56.1, Dkt. 26-4, ¶ 13.)

Both funds provide a process for appealing denied claims. As the Funds' SPDs specify, a participant may appeal the denial of a claims application within 180 days of receiving notice of the denial. (*See* A.R. 101 (Health Fund SPD), 237 (Pension Fund SPD).) The SPDs also state explicitly that a participant must complete the administrative appeals process before filing an action in court against the Funds. (A.R. 101 ("You must file an appeal with the appropriate party and follow the process completely before you can bring an action in court."), 237 ("You must file an appeal before you can file any kind of legal action to review the denial of benefits.").)

## II.    Plaintiff's Applications for Benefits

Plaintiff was employed in the building services industry and a member of the Service Employees International Union, Local 32BJ ("Union"), for over 19 years, between December 1984

4

and March 2004. (*See* Defs.' 56.1, Dkt. 26-4, ¶ 13; *see also* Complaint, Dkt. 1-1, at ECF[3] 2; A.R. 403–04 (certifying that Plaintiff was a Union member as of December 19, 1984).) Pursuant to collective bargaining agreements with the Union, Plaintiff was entitled to health benefits from the Health Fund and pension benefits from the Pension Fund. (Defs.' 56.1, Dkt. 26-4, ¶ 13.)

On March 16, 2004, Plaintiff suffered an injury on the job while taking out the trash. (*See* Complaint, Dkt. 1-1, at ECF 2; Defs.' 56.1, Dkt. 26-4, ¶ 16.) Relying on Plaintiff's Workers' Compensation report, filed shortly after the incident, Defendants take the view that "something fell & hit [Plaintiff's] left leg, left arm & lower back" while she was taking out garbage. (A.R. 363; *see also* Defs.' 56.1, Dkt. 26-4, ¶ 16.) Plaintiff, however, avers that she "fell" and "hurt [her] neck and back right side." (Plaintiff's 56.1 Statement ("Pl.'s 56.1"), Dkt. 32, ¶ 16.) Plaintiff stopped working shortly thereafter. (*See* Complaint, Dkt. 1-1, at ECF 2; *see also* A.R. 350 (indicating that Plaintiff's last date of work was March 16, 2004, and her covered employment ended on April 2, 2004).)

In June 2007, following Plaintiff's application for Social Security Disability Insurance Benefits ("DIB"), an SSA administrative law judge ("ALJ") determined that Plaintiff qualified for DIB under the Social Security Act. (A.R. 362.) According to the ALJ, Plaintiff "was injured at work in March 2004, during a slip and fall accident," causing her to suffer "back and neck pain." (A.R. 359–60.) The ALJ observed that "[t]wo days after the accident," a doctor prescribed that Plaintiff wear a "cervical collar" and "should not perform any strenuous activity for ten days." (A.R. 359.) Ultimately, with respect to Plaintiff's physical capability, the ALJ found that Plaintiff "retain[ed] the residual functional capacity to perform a narrow range of light work." (A.R. 360.)

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Based on the medical evidence, however, the ALJ also found that, beginning on August 22, 2005, Plaintiff suffered from "a severe psychological disorder in addition to her back and neck pain, significantly affecting her concentration and ability to deal with competitive work stress." (*Id.*) Accordingly, the ALJ determined that the combination of Plaintiff's "physical residual functional capacity" and her "non-exertional psychological limitations as of August 22, 2005," rendered Plaintiff disabled under the SSA's regulations as of August 22, 2005. (*Id.*; *see also* A.R. 361.) The ALJ therefore concluded that, "based on the application filed on March 17, 2005, [Plaintiff was] entitled to a period of disability commencing August 22, 2005, and to Disability Insurance Benefits" under the Social Security Act. (A.R. 362.) But the ALJ also noted that "[Plaintiff]'s medical condition may improve," and that the SSA would "perform a reexamination in one to two years, to determine whether medical improvement ha[d] occurred." (*Id.*) On July 16, 2007, the SSA mailed a Notice of Award to Plaintiff, detailing the amount of her DIB and telling Plaintiff that her case would be reviewed in June 2009 because "[t]he doctors and other trained personnel who decided that you are disabled expect your health to improve."[4] (A.R. 314, 317.)

Subsequently, on October 15, 2007, Plaintiff submitted an application to Defendants for disability benefits,[5] asserting a total disability beginning "March 16, 2004—[the] date [she] last worked." (*See* A.R. 324; Defs.' 56.1, Dkt. 26-4, ¶ 15.) Plaintiff explained on her application that "[t]he pain disorder and physical condition that I'm suffering is making me unable to work." (A.R.

---

[4] The record is silent as to whether the SSA reviewed Plaintiff's case in June 2009, or whether Plaintiff continued to receive DIB after June 2009.

[5] Plaintiff avers that she presented an application in person in December 2004. (Pl.'s 56.1, Dkt. 32, ¶ 17.) This alleged December 2004 application is not in the record. The only evidence in the record is a letter from the Pension Fund, dated December 8, 2004, indicating that Plaintiff had requested a pension application and enclosing instructions and information regarding Plaintiff's pension benefits. (*See* Dkt. 22, at ECF 18–21.)

6

324.) Included with Plaintiff's application was an Attending Physician's Statement of Disability, prepared by psychologist Dr. Nicholas Radcliffe, indicating that Plaintiff's "primary restrictions are related to [her] physical condition, but her psychological condition amplifies her difficulties." (A.R. 325.)

On November 15, 2007, Defendants sent Plaintiff a letter advising her that further documentation was required to show that Plaintiff had become totally disabled while working in covered employment, particularly given that more than nine months had passed since her covered employment ended in 2004.[6] (A.R. 353–54; *see also* Defs.' 56.1, Dkt. 26-4, ¶ 17.) In response to the letter, Plaintiff submitted the ALJ's June 2007 decision awarding DIB, along with some of the medical evidence underlying the ALJ's decision. (*See* Defs.' 56.1, Dkt. 26-4, ¶¶ 19–23; A.R. 327–345; *see also* A.R. 359–60 (ALJ describing medical evidence).) These medical records submitted to Defendants included a medical source statement from Dr. Radcliffe, dated February 9, 2007, stating that Plaintiff was "suffering from psychological distress including deficits of attention and concentration, depression and anxiety as a result of the 3-16-04 accident," and that the onset date of these problems was August 22, 2005. (A.R. 337.) The medical records also included a psychiatric evaluation, dated December 16, 2006, finding "stress related and physical problems [that] may significantly interfere with [Plaintiff's] ability to function on a daily basis." (A.R. 338, 340.) Further, the medical records included a two-page "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" stating that Plaintiff suffered from "anxiety + depression secondary to physical limitations" and that she could not stand for long periods of time. (A.R.

---

[6] Defendants' November 15, 2007 letter mistakenly indicated that Plaintiff needed to establish total disability as of December 18, 2006, rather than as of the date that Plaintiff's covered employment ended in 2004. (*See* Defs.' 56.1, Dkt. 26-4, ¶ 18; *see also* A.R. 350–54.) On December 20, 2007, Defendants sent Plaintiff an amended letter correcting this mistake. (A.R. 350–52.)

7

342–43.) Finally, the medical records included a residual functional capacity questionnaire prepared by neurologist Dr. Lyzette Velazquez, who had treated Plaintiff since July 2004, indicating, among other things, that Plaintiff had a limited range of motion, could walk two to three city blocks without rest or severe pain, could regularly take public transportation, could sit for 20 minutes and stand for 30 minutes at one time, did not have to use a cane or other assistive device, and during an 8-hour work day would have to take unscheduled 10-minute breaks approximately every one to two hours. (A.R. 327–33; *see also* A.R. 359.)

On February 1, 2008, Defendants denied Plaintiff both an LTD Benefit and Disability Pension. (Defs.' 56.1, Dkt. 26-4, ¶ 24; *see also* A.R. 348–49.) Defendants explained that Plaintiff was being denied LTD benefits "because the information provided by you and your physician shows that your psychological issues developed after you left covered employment. Additionally, you did not provide sufficient information . . . to show that your pain disorder associated with general medical condition [sic] makes you unfit to work in any capacity." (A.R. 348.) Defendants gave substantially the same explanation for denying Plaintiff a Disability Pension. (*See id.*) Although Defendants' denial letter made clear that Plaintiff had "the right to appeal" within 180 days, and that Plaintiff "must . . . first exhaust the Plan's appeal procedure" before pursuing an action in court, Plaintiff did not appeal Defendants' February 1, 2008 decision. (*See* A.R. 349; Defs.' 56.1, Dkt. 26-4, ¶ 26.) Plaintiff does not dispute her failure to appeal the February 1, 2008 decision, but rather simply states that "it was stressing me too much." (Pl.'s 56.1, Dkt. 32, ¶ 26.)

Nearly three years later, on January 6, 2011, Plaintiff submitted a second application to Defendants for disability benefits, again claiming a total disability based on the accident at work on March 16, 2004. (Defs.' 56.1, Dkt. 26-4, ¶ 27; *see also* A.R. 313.) Included with the application was the July 2007 Notice of Award from the SSA, discussed above, stating that the SSA had found

that Plaintiff "became disabled under [its] rules on August 22, 2005." (*See* A.R. 314; *see also* Defs.' 56.1, ¶ 27.) Accordingly, on February 7, 2011, Defendants again denied Plaintiff both an LTD Benefit and Disability Pension—reasoning, like the first time, that Plaintiff did not become totally disabled until 2005, after her covered employment had ended in 2004. (*See* A.R. 320–21.) As with Plaintiff's first application, Defendants' denial letter detailed Plaintiff's right to appeal the decision within 180 days and explained that Plaintiff had to exhaust appeal procedures before pursuing an action in court, but Plaintiff did not appeal. (*See* A.R. 321–22; *see also* Defs.' 56.1, Dkt. 26-4, ¶¶ 31–32.) Although Plaintiff does not dispute this fact, Plaintiff avers that she "was already having a very heavy hard time," and appealing "was too much for [her] and [she] was tired of going through all the circumstances of not having a job, not having money, losing [her] apartment, and losing certain family members." (*See* Pl.'s 56.1, Dkt. 32, ¶¶ 31–32.)

In 2014, Plaintiff applied for and was awarded a regular pension from the Pension Fund of $392 per month, which was subsequently increased to $479 per month after Plaintiff was credited with additional pension service credits. (*See* Defs.' 56.1, Dkt. 26-4, ¶¶ 33–34; *see also* A.R. 365–78.) In August 2018, Plaintiff wrote to Defendants to assert that she was entitled to a higher pension because of missing pension credits. (Defs.' 56.1, Dkt. 26-4, ¶ 35; *see also* A.R. 401.) Defendants replied and advised Plaintiff that she had already been credited with the additional service credits. (Defs.' 56.1, Dkt. 26-4, ¶ 35; *see also* A.R. 395–400.)

### III. The Current Proceedings

Plaintiff, proceeding *pro se*, filed the present action in the Supreme Court of New York, Queens County, on March 7, 2019. (*See* Complaint, Dkt. 1-1, at ECF 4–5.) Plaintiff alleges that Defendants denied her disability benefits "without issuing a valid reason," and she requests that Defendants "be ordered to provide [her] with the disability benefits that [she] is due[.]" (*Id.* at ECF 2–3.)

9

On May 6, 2019, Defendants removed the action to this Court on the basis that it arises under Section 502(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a). (*See* Dkt. 1.) *See generally* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]"). Following brief discovery, Defendants moved for summary judgment, arguing that Plaintiff's claims were not properly exhausted, are time-barred, and in any event fail on the merits. (*See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Defs.' MSJ"), Dkt. 26-5, at 12–18.) After several extensions of time, Plaintiff filed an opposition to the motion (*see* Dkts. 13–22), to which Defendants replied (Dkt. 26-7).

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that the summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if the record evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248; *see also id.* at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (internal quotation and citation omitted). Moreover, "[o]nly disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted). Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphases in original).

When considering a dispositive motion made by or against a *pro se* litigant, the Court is mindful that a *pro se* party's pleadings must be "liberally construed" in favor of that party and "are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9–10 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). The Second Circuit "liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (internal quotation marks and citations omitted). Nevertheless, "[p]roceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Rodriguez v. Hahn*, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002) (citation omitted).

"Courts reviewing a challenge of denial of benefits under ERISA may do so on a motion for summary judgment, which provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record." *Zarringhalam v. United Food & Com. Workers Int'l Union Local 1500 Welfare Fund*, 906 F. Supp. 2d 140, 155 (E.D.N.Y. 2012) (internal quotation marks and citation omitted).

**II.     Exhaustion**

Defendants first argue that summary judgment in their favor is warranted because Plaintiff failed to exhaust her administrative remedies prior to commencing suit.  "[T]he federal courts—including [the Second] Circuit—have recognized a 'firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases.'"  *Paese v. Kennedy Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006) (quoting *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993)).  This exhaustion requirement, as the Second Circuit has acknowledged, serves a number of purposes: (1) to "uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts"; (2) to "provide a sufficiently clear record of administrative action if litigation should ensue"; (3) to "assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo*"; (4) to "help reduce the number of frivolous lawsuits under ERISA"; (5) to "promote the consistent treatment of claims for benefits"; (6) to "provide a nonadversarial method of claims settlement"; and (7) to "minimize the costs of claims settlement for all concerned."  *Kennedy*, 989 F.2d at 594 (citing *Denton v. First Nat'l Bank of Waco, Tex.*, 765 F.2d 1295, 1300 (5th Cir. 1985); *Amato v. Bernard*, 618 F.2d 559, 567 (9th Cir. 1980)).  Thus, it is well-settled that "exhaustion of administrative remedies provided under a benefit plan is a prerequisite to filing an action which arises under ERISA."  *Shamoun v. Bd. of Trustees*, 357 F. Supp. 2d 598, 602 (E.D.N.Y. 2005) (collecting cases); *see also Klotz v. Xerox Corp.*, 332 F. App'x 668, 669 (2d Cir. 2009) (summary order) (collecting cases); *Zarringhalam*, 906 F. Supp. 2d at 152 (collecting cases).  Nonetheless, where a plaintiff "make[s] a clear and positive showing that pursuing available administrative remedies would be futile, the purposes behind the requirement of exhaustion are no longer served," and the failure to exhaust may be excused.  *Kennedy*, 989 F.2d at 594 (internal quotation marks and citation omitted); *accord Zarringhalam*, 906 F. Supp. 2d at 152–53.

Here, the Funds indisputably provide a process for appealing the denial of claims, and the SPDs make clear that a claimant must file an internal appeal before bringing an action in court. (*See* A.R. 101, 237.) Additionally, in denying Plaintiff disability benefits in 2008 and 2011, Defendants both times explicitly informed Plaintiff of her right to appeal within 180 days of receiving notice and notified her of the requirement to exhaust appeal procedures before filing an action in court. (A.R. 349 (February 1, 2008 claim-denial letter to Plaintiff stating, "You or your authorized representative have the right to appeal this decision by filing a written appeal with the Appeals Committee of the Board of Trustees within 180 days of receiving this notice. . . . You must, however, first exhaust the Plan's appeal procedure before you can pursue an action in court."); *see also* A.R. 321–22 (February 7, 2011 claim-denial letter to Plaintiff stating the same).) Plaintiff did not appeal the denial of benefits in 2008 or 2011, and therefore did not exhaust available administrative remedies. (Defs.' 56.1, Dkt. 26-4, ¶¶ 26, 32.)

Plaintiff does not dispute her failure to exhaust administrative remedies; rather, she explains that "it was stressing [her] too much," and further action was "too much" for her to handle at the time because she "was already having a very heavy hard time." (*See* Pl.'s 56.1, ¶¶ 26, 31–32.) This explanation, however, provides no "clear and positive showing" that pursuing available administrative remedies would have been futile. *See Kennedy*, 989 F.2d at 594. Indeed, it is not clear why Plaintiff was able to twice file applications for disability benefits but unable to file an appeal when those applications were denied.

Plaintiff also argues that the period for her to submit an administrative appeal should be equitably tolled "on account of the onset of her Major Depression." (Plaintiff's Memorandum in Opposition to the Motion for Summary Judgment ("Pl.'s Opp."), Dkt. 22, at ECF 2.) This argument is unavailing because Plaintiff never sought to file an appeal that was denied as untimely.

13

Therefore, even if the Court were to agree that any deadline to file an administrative appeal with the Funds should be equitably tolled on account of Plaintiff's psychological limitations,[7] there would still be no grounds to conclude that pursuing an administrative appeal would have been futile. The cases that Plaintiff cites (*see id.*) are inapposite, as they all either involve plaintiffs who actually attempted to exhaust administrative remedies, but were unsuccessful because their appeals were untimely, or do not address equitable tolling in the context of an exhaustion requirement, but rather address the issue in a different context, such as the statute of limitations. *See Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d 74, 80–81 (2d Cir. 2003); *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 511–14 (2d Cir. 2002); *Brown v. Parkchester South Condos.*, 287 F.3d 58, 59–61 (2d Cir. 2002); *Boos v. Runyon*, 201 F.3d 178, 184–85 (2d Cir. 2000). Thus, Plaintiff's equitable-tolling argument does not provide a basis for excusing her failure to exhaust administrative remedies.

Finally, Plaintiff argues that Defendants "engaged in a course of conduct[] of misrepresenting and giving [her] inaccurate and false information as to her rights under the respective contract[s]." (Pl.'s Opp., Dkt. 22, at ECF 2; *see also id.* at ECF 3 (asserting that Defendants provided Plaintiff "misleading" information and "misstatements").) However, no reasonable factfinder could find that Plaintiff was provided inaccurate or misleading information with respect to the need to exhaust administrative remedies before challenging any denial of disability benefits in court. The letters that Plaintiff received from Defendants denying her applications for disability benefits in 2008 and 2011 clearly and accurately state that Plaintiff had the right to appeal—and, indeed, had to appeal before pursuing any action in court. (*See* A.R.

---

[7] The Court makes no determination as to whether any deadline to file an administrative appeal with the Funds should be equitably tolled in Plaintiff's case on account of her psychological limitations, or otherwise.

14

321–22, 349 (denial letters outlining the Funds' appeal procedures); *see also* A.R. 101–03, 237–38 (SPDs describing the Funds' appeal procedures).) Plaintiff provides no evidence that she was provided false or misleading information about the Funds' appeals process.

In short, Plaintiff indisputably failed to exhaust administrative remedies, and Plaintiff fails to show any genuine dispute as to any fact that would establish that pursuing administrative remedies would have been futile, such that waiver of the exhaustion requirement would be warranted. Accordingly, Defendants are entitled to summary judgment on this basis. *See Anderson*, 477 U.S. at 248; *Klotz*, 332 F. App'x at 669–70; *Kennedy*, 989 F.2d at 594.

### III. Merits

Even if, however, the Court were to conclude that waiver of the exhaustion requirement is appropriate in this case, Defendants would still be entitled to summary judgment on the merits of Plaintiff's claims, and the Court therefore grants Defendants' motion on this alternative basis.[8]

---

[8] Defendants also argue that summary judgment in their favor is warranted because Plaintiff's suit is time-barred. In an action such as this one to recover benefits under 29 U.S.C. § 1132(a)(1)(B), New York's six-year statute of limitations applies. *Burke v. PWHC LLP Long Term Disability Plan*, 572 F.3d 76, 78 (2d Cir. 2009) (per curiam) (citing *Miles v. N.Y. State Teamsters Conf. Pension & Ret. Fund Emp. Pension Benefit Plan*, 698 F.2d 593, 598 (2d Cir. 1983)). Here, Plaintiff filed suit on March 7, 2019—over eleven years after her first denial of disability benefits in 2008, and over eight years after her second denial of disability benefits in 2011. (*See* Complaint, Dkt. 1-1, at ECF 5; *see also* A.R. 320 (February 7, 2011 denial letter), 348 (February 1, 2008 denial letter).) Statutes of limitations, however, "are generally subject to equitable tolling where necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing," although this type of relief "is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri v. Building Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004) (citations omitted). The Second Circuit has indicated that "equitable tolling may be appropriate where the plaintiff's failure to comply with the statute of limitations is attributable to the plaintiff's medical condition." *Brown*, 287 F.3d at 60. Plaintiff argues that the statute of limitations should be tolled in this case on account of her depression and lack of mental competence during the limitations period. (Pl.'s Opp., Dkt. 22, at ECF 2.) Defendants respond that Plaintiff fails to establish a causal connection between her psychological limitations and her delay in filing suit. (Defendants' Reply ("Defs.' Reply"), Dkt. 26-7, at ECF 4–5.) For present purposes, the Court assumes, without deciding, that the limitations period has been tolled.

A denial of benefits challenged under Section 502(a) of ERISA, 29 U.S.C. § 1132(a), "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan administrator is given such discretionary authority, the Court "will not disturb the administrator's ultimate conclusion unless it is arbitrary and capricious." *Fuller v. J.P. Morgan Chase & Co.*, 423 F.3d 104, 106–07 (2d Cir. 2005) (internal quotation marks omitted) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995)). Here, the Funds' trustees, in accordance with the Trust Agreements, have the "sole discretion" to determine eligibility for benefits and interpret the terms of plan documents. (*See* A.R. 16 (Health Fund Trust Agreement), 163 (Pension Fund Trust Agreement).)

Under arbitrary and capricious review, "[a] court may overturn a plan administrator's decision to deny benefits only if the decision was 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Pagan*, 52 F.3d at 442). "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance.'" *Id.* (alterations in original) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)). At the same time, however, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor" in reviewing the administrator's or fiduciary's decision. *Firestone*, 489 U.S. at 115 (internal quotation marks, alteration, and citation omitted). A conflict of interest exists when "a plan administrator both evaluates claims for benefits and pays benefits claims." *Metro.*

16

*Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008).  Such is the case here.  (*See* A.R. 16, 163.)  And even though the Funds' trustees are evenly balanced between management and union members (Defs.' 56.1, Dkt. 26-4, ¶ 2), that does not negate the conflict of interest, *see Durakovic v. Building Serv. 32BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010).  The weight accorded to an existing conflict of interest "varies in direct proportion to the 'likelihood that the conflict affected the benefits decision[.]'"  *Id.* at 139 (alteration omitted) (quoting *Glenn*, 554 U.S. at 117).

Here, there is no need to determine the weight that should be given to the existing conflict of interest because even under *de novo* review, and after resolving all doubts in favor of Plaintiff, the Court cannot conclude that Plaintiff was wrongfully denied disability benefits.  To qualify for an LTD Benefit under the Health Fund, a claimant must "become totally disabled while working in covered employment" (A.R. 93), and to qualify for a Disability Pension under the Pension Fund, a claimant must "become totally and permanently disabled while working in covered employment" (A.R. 217).  Total disability means the claimant is "unable to work in any capacity as a result of bodily injury or disease."  (A.R. 93; *see also* A.R. 217 ("Total and permanent disability is the permanent inability to work in any capacity[.]").)  In both 2008 and 2011, Defendants denied Plaintiff an LTD Benefit and a Disability Pension because they determined that she did not become totally disabled while working in covered employment, but rather became totally disabled in 2005, after leaving covered employment in 2004.  (*See* A.R. 320–22 (February 7, 2011 denial letter), 348–49 (February 1, 2008 denial letter).)

Having thoroughly reviewed the record and afforded Defendants no deference, the Court cannot conclude that Defendants erred.  The Court, like the SSA's ALJ, accepts that Plaintiff fell and injured her neck, back, and right side while at work in March 2004.  (*See* A.R. 358–59; *see also* Pl.'s 56.1, Dkt. 32, ¶ 16.)  Plaintiff indicated on her benefits applications that she last worked

17

on March 16, 2004, the date of her accident (A.R. 313, 324), and thus, there is no genuine dispute that Plaintiff's covered employment ended, as Defendants' records indicate, on April 2, 2004 (*see* A.R. 321, 350).

There is also no genuine dispute that to the extent Plaintiff became totally disabled, such disability occurred in 2005, after Plaintiff's covered employment had ended. Regarding Plaintiff's physical capability following the accident, the ALJ found that "[t]he evidence supports a finding that [Plaintiff] retains the residual functional capacity to perform a narrow range of light work." (A.R. 360.) This evidence, as recounted by the ALJ, included the fact that after the accident Plaintiff had to wear a "cervical collar" and avoid "any strenuous activity for ten days," and a statement in 2006 by neurologist Dr. Velazquez that "[Plaintiff] was partially disabled, and may benefit from pain management." (A.R. 359.) Dr. Velazquez's residual functional capacity questionnaire, which Plaintiff submitted to Defendants as part of her first application for disability benefits, is consistent with the ALJ's findings regarding Plaintiff's physical limitations. (*See* A.R. 327–33; *see also* Defs.' 56.1, Dkt. 26-4, ¶ 19; Pl.'s 56.1, Dkt. 32, ¶ 19.) For example, the questionnaire indicates that Plaintiff had a limited range of motion, could walk two to three city blocks without rest or severe pain, could sit for 20 minutes and stand for 30 minutes at a time, did not have to use a cane or other assistive device, and during an 8-hour work day would have to take 10-minute breaks approximately every one to two hours. (A.R. 328–29.) Although the ALJ concluded that Plaintiff was disabled, the ALJ did so only when considering Plaintiff's physical limitations "in combination with non-exertional psychological limitations as of August 22, 2005." (A.R. 360.) Accordingly, despite Plaintiff claiming disability as of March 16, 2004, the ALJ amended the onset date to August 22, 2005. (A.R. 358.) In notifying Plaintiff of the ALJ's

decision, the SSA informed Plaintiff that it had "found that [she] became disabled . . . on August 22, 2005." (A.R. 314.)

Nothing in the record rebuts or calls into question the ALJ's finding that Plaintiff became disabled in August 2005. In fact, the February 9, 2007 medical source statement of Plaintiff's psychologist, Dr. Radcliffe, that Plaintiff submitted as part of her first application for disability benefits explicitly states that the onset date of Plaintiff's psychological limitations was August 22, 2005. (*See* A.R. 337; *see also* Defs.' 56.1, Dkt. 26-4, ¶ 20; Pl.'s 56.1, Dkt. 32, ¶ 20.) Moreover, nothing that Plaintiff submits in opposition to Defendants' summary judgment motion helps her. Plaintiff submits several prescriptions, the earliest of which is dated October 12, 2004, and prescribes Plaintiff Vicodin tablets. (Pl.'s Opp., Dkt. 22, at ECF 12–16.) Plaintiff also submits a "Psychological Evaluation and Consultation" by psychologist Dr. Howard Rombom, dated August 22, 2005, which is consistent with the ALJ's findings—indeed, the ALJ discussed and relied upon Dr. Rombom's evaluation in concluding that Plaintiff was disabled as of August 22, 2005. (*See id.* at ECF 7–10; A.R. 359–60.) Finally, Plaintiff argues that Defendants made "misstatements" and gave her "misleading" information, and "each time she went to visit their office to try and apply or get advi[c]e as to what her rights were to the benefits in the plan, she was put off." (Pl.'s Opp., Dkt. 22, at ECF 3.) This argument does not help Plaintiff because there is no indication that Defendants based their denial of disability benefits on any information, misleading or not, that was relayed to Plaintiff. Rather, Defendants denied Plaintiff disability benefits because they determined that Plaintiff had not become totally disabled—that is "unable to work in any capacity as a result of bodily injury or disease"—while in covered employment, which undisputedly had ended by April 2, 2004. (*See* A.R. 93, 320–22, 348–49.) While the Court is sympathetic to

19

Plaintiff's unfortunate circumstances, even giving Plaintiff the benefit of *de novo* review and the benefit of every doubt, the Court concludes that Defendants did not err in their determination.[9]

## CONCLUSION

Defendant's motion for summary judgment is granted and this action is dismissed. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants and close this case. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal of this Memorandum and Order would not be taken in good faith, and therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 4, 2021
Brooklyn, New York

---

[9] Plaintiff requests leave to amend the Complaint to add several claims: (1) wrongful denial of benefits under ERISA; (2) breach of contract; (3) unjust enrichment; (4) breach of the covenant of good faith and fair dealing; and (5) unfair trade practices. (Pl.'s Opp., Dkt. 22, at ECF 3.) The Court denies leave to amend as futile. *See Hunt v. All. N. Am. Govt. Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("[I]t is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile."). First, the Complaint already asserts a claim of wrongful denial of benefits under ERISA—this was the basis for Defendants' removal of the case (*see* Notice of Removal, Dkt. 1, ¶ 2), and that claim has now been decided, as discussed above. Second, the state-law claims that Plaintiff wishes to add are completely preempted by ERISA because they merely seek "to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004); *see also Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 114 (2d Cir. 2008) (holding that ERISA preempted plaintiff's state common law claims, including breach of contract and breach of the covenant of good faith and fair dealing); *Kolasinski v. Cigna Healthplan of CT, Inc.*, 163 F.3d 148, 149 (2d Cir. 1998) (per curiam) (affirming ERISA preemption of plaintiff's state-law claims of breach of contract and unfair trade practices); *Neurological Surgery, P.C. v. Siemens Corp.*, No. 17-CV-3477 (ADS) (AKT), 2017 WL 6397737, at *5 (E.D.N.Y. Dec. 12, 2017) (concluding that plaintiff's "contractual, quasi-contractual, and unjust enrichment claims" were all preempted by ERISA).